Agnes, A.J.
This matter is before the Court on the request of the plaintiff, Banner Industries (“Banner”), for a preliminary injunction against the defendant, Robert Bilodeau (“Bilodeau”), and against Northeast Sentrol, Inc. (“NSI”). The plaintiff seeks to enforce its non-competition, non-solicitation and confidentiality agreements with the defendant Bilodeau. In order to prevail, Banner bears the burden of proving the following: its likelihood of success on the merits, that it will suffer irreparable harm if injunctive relief is not granted, and that its injury will outweigh any harm that Bilodeau will suffer as a result of granting the injunction.
BACKGROUND
The essential facts are not in dispute. Plaintiff Banner is a Massachusetts retail distributor of high-tech air purity products and components, including valves, vacuum fittings, tubing, and gauges that are used in the high technology manufacturing industry, particularly in the semi-conductor industry. Defendant NSI sells products made by some of the same manufacturers with whom the plaintiff deals, but the customers of NSI operate in a wide variety of markets such as semiconductors, aerospace, biopharmaceuticals, pulp and paper, analytical chemistry, and chemical processing industries. In late May of 2000, Banner hired Robert Bilodeau as a salesperson. At that time, Bilodeau had many years of sales experience. He had worked for various marketers of vacuum products since 1980, and his job responsibilities ranged from providing sales support and technical assistance, to sales and marketing, to budgeting and various management roles. Bilodeau had not worked in the high purity flow component industry prior to his employment with Banner. While employed by Banner, Bilodeau had access to client lists as well as information about various manufacturers. Banner requires its employees to use security passwords and limits their access to financial information. Banner trained Bilodeau through seminars, meetings, and other in-house experience so that he could understand the functions of the product and thereby meet the needs of Banner’s clients.
As a condition of his employment with Banner, Bilodeau signed a noncompete agreement. This agreement provided that during his employment with Banner, and for a period of three years thereafter, Bilodeau would be precluded from engaging in any competitive business with Banner.[1] Specifically, Bilodeau was to refrain from soliciting Banner’s customers or from disclosing the names of those customers to anyone else.[2] The agreement also provided that Bilodeau could not “supply or divulge . . . any of [Banner’s] methods of conducting or obtaining business . . .”
Banner terminated Bilodeau’s employment on July 11, 2002 for financial reasons. Bilodeau subsequently became employed by NSI. Banner claims that NSI is a direct competitor in sales of high purity flow components, although Bilodeau and NSI claim that there is only a small overlap in sales competition between Banner and NSI. A fair reading of the material submitted by the parties suggests that Banner and NSI are in competition in some, though not in a majority, of the markets in which they do business. Banner now seeks a temporary restraining order to enjoin Bilodeau from working for NSI or any other competitor, and seeks to enjoin his use of customer and manufacturer information taken from his employ at Banner.
DISCUSSION
I. Likelihood of Success on the Merits
The public policy of the Commonwealth of Massachusetts favors the right of an employee to move from job to job unencumbered by restrictions that are not narrowly tailored to protect an employer’s interests in the goodwill of a business, a trade secret, or confidential business information. “It long has been settled that contracts restraining freedom of employment can be enforced only when they are reasonable and not wider than is necessary for the protection to which the employer is entitled and when not injurious to the public interest.” Club Aluminum Co. v. Young, 263 Mass. 223, 225 (1928) (Rugg, C.J.).[3] An employee “may carry away and use the general skill or knowledge acquired during the course of the employment.” Dynamics Research Corp. v. Analytic Sciences Corporation, 9 Mass.App.Ct. 254, 267 (1980), citing Junker v. Plummer, 320 Mass. 76, 79 (1946). Massachusetts courts recognize legitimate business interests in an employer’s goodwill, including trade secrets and confidential information. All Stainless, Inc. v. Colby, 364 Mass. 773, 779 (1974). In other words, “general knowledge, experience, memory and skill” belong to the employee even if that knowledge and skill is enhanced by the employment experience. Junker v. Plummer, 320 Mass. 76, 79 (1946). For example, if an employer designs a machine, invents a process, or discovers a formula that has a special business application, the *706 employer has a right to prevent a former employee from using confidential information about the machine, process or formula to be used in a competitive business. Id. The employer is entitled to assurance that its employees will not “appropriate the [employer’s] special knowledge, skill, and brain child.” Junker v. Plummer, 320 Mass. at 79 (employer’s unique machine constituted trade secret from which employee defendant gained special knowledge). Compare National Hearing Aid Centers, Inc. v. Avers, 2 Mass.App.Ct. 285, 289 (1974) (hearing aid retailer not entitled to prohibit employee from selling hearing aids).
A. Employee Training and Seminars
Sales and marketing skills that are developed on the job normally fall under the category of general and ordinary skills. Club Aluminum Co. v. Young, 263 Mass. at 226-28 (employer’s cooking utensil products too ordinary and well known to allow enforcement of noncompete covenant). See also Routhier Placement Specialists v. Brown et al., No. 02-3532-E, 15 Mass. L. Rptr. 246, 2002 Mass. Super. LEXIS 362, at *4 (employee who provided recruitment and staffing services for employer could not be restrained from performing recruiting services for competing employer); see also Fortune Personnel Consultants v. Hagopian, No. 97-24440-A, 8 Mass. L. Rptr. 49, 1997 WL 796494 at *2-*3 (personnel recruiter could not be enjoined from competing with employer despite in-office and seminar training). A product that is familiar to the public, and which has a common use, does not create an issue of special skills. Club Aluminum Co. v. Young, 263 Mass. at 226-28.
Knowledge confidentially gained in the course of employment may be made the subject of restrictive agreement and acts in derogation of such a contract will be restrained. But an employer cannot by contract prevent his employee from using the skill and intelligence acquired or increased and improved through experience or through instruction received in the course of the employment. The employee may achieve superiority in his particular department by eveiy lawful means at hand, and then, upon the rightful termination of his contract for service, use that superiority for the benefit of rivals in trade of his former employer.
Id. at 226-27.
Although Banner is a retailer of products and hires its employees as salespersons, it nevertheless seeks to distinguish the skills its employees gain as special because of the sophisticated, technical nature of its products. To bolster its view, Banner points to the necessity of providing its employees with extensive and costly training so that they may become knowledgeable enough about the product to sell it.
The character of what are ordinary sales skills is not changed simply because a business engages in sales of a unique or “hi-tech” product, which may require the employee to have some knowledge about its technical aspects. The fact that the nature of the product may require more investment by the employer does not change the fundamental equitable principle that favors free trade and competition. First E. Mortgage Corp. v. Gallagher, 2 Mass. L. Rptr. 350, No. 94-3727F (July 21, 1994) (employee must be permitted to use his “enthusiasm, personality and abilities” to earn a livelihood absent competing interests). Further, Banner is a retailer, and not a manufacturer of high-purity flow products. Because Banner learns from its manufacturers and distributors whatever knowledge it passes to its employees, the information it seeks protection for is not uniquely its own and is available to other distributors such as NSI. The retail function of Banner’s business also emphasizes the sales aspects of the training its employees receive.
B. Confidential Client Lists and Other Information
A question remains as to whether Banner’s client and manufacturer lists constitute confidential information. Six factors are examined in analyzing whether information is confidential: (1) the extent to which the information is known outside plaintiffs business; (2) the extent to which it is known by employees and others involved in the business; (3) the extent of measures taken by the employer to guard the secrecy of the information; (4) the value of the information to the employer and to his competitors; (5) the amount of effort or money expended by the employer in developing the information; and (6) the ease or difficulty with which the information could be properly acquired or duplicated by others. Jet Spray Cooler, Inc. v. Crompton, 361 Mass. 835, 840 (1972).
Banner seeks protection of its client lists, which detail customer identities, buying needs, and contacts. Banner also seeks protection of its lists of manufacturers, which include quality, price, and other product information. An employer must have taken steps to protect information before it can be considered confidential. National Hearing Aid Centers, Inc. v. Avers, 2 Mass.App.Ct., 285, 290 (1974) (suggesting employer’s customer list is confidential information when described as such in contract with defendant employee); Mitchell John Coiffures, Inc. v. Jordan and Company, Inc., No. 2000-01272, slip op. at 5 (Super. Ct. 2002) (employer’s failure to express to employees that customer information was confidential precludes characterization as such). Banner required Bilodeau to use a password to access its databases, and to sign an agreement which specifically forbade Bilodeau from using its client lists and from soliciting its clients after the employment relationship had terminated.
The manufacturer lists cannot be considered confidential information, as they contain information that Banner learned from its manufacturers and that could be obtained by others such as NSI, as noted above. *707 See Defendant’s Memorandum in Support of its Opposition to Plaintiffs Motion, Exhibit A, Affidavit of Timothy W. Crowley. The manufacturer lists are not even mentioned in the noncompete agreement. Further, there has been no evidence that Bilodeau is in possession of any tangible client lists, books, or other documented information. Client relationships alone cannot be protected. Routhier Placement Specialists v. Brown, et. al., 15 Mass. L. Rptr. 246, 2002 Mass. Super. LEXIS at *4. Solicitation of a former employer’s clients may be protected by a noncompete covenant, but Banner has not presented any evidence that Bilodeau or NSI have solicited its clients. Fortune Personnel Consultants v. Hagopian, 8 Mass. L. Rptr. 49, 1997 WL 796494, at *3 (barring former employee only from contacting clients she worked with during her employment with plaintiff); National Hearing Aid Centers, Inc. v. Avers, 2 Mass.App.Ct. at 290.[4]
II. Whether Banner Will Suffer Irreparable Harm
Because Banner is not likely to succeed on the merits, it cannot demonstrate that it will suffer irreparable harm if the injunction is not granted. Banner cannot claim protection for its client lists, or for its manufacturer lists, absent a showing that Bilodeau has these lists in his possession. Further, there is simply no evidence that Bilodeau or NSI have solicited Banner’s clients.
III. Balance of the Harm
Bilodeau’s interest in earning a living and supporting his family far outweighs Banner’s speculative interest in protecting its investment in its employees, or its monetary interest in stifling adverse competition. Woolley’s Laundry v. Silva, 304 Mass. 383, 387 (1939) (“the public and the individual have an interest in every person carrying on his trade or occupation freely ... ^Interference with individual liberty of trade ... is contrary to public policy”). Further, granting the injunction would not comport with the realities of the contemporary employment market. Today, it is exceptional for an individual to join the workforce with the expectation that he will remain with his employer for the duration of his career. Employee mobility has become the norm as a result of economic and marketplace changes that have occurred over the past few decades. See Christine M. O’Malley, Covenants Not to Compete in the Massachusetts Hi-Tech Industry: Assessing the Need For a Legislative Solution, 79 B.U.L.Rev. 1215, 1215-17 (1999) (contrasting long-term employee loyalty of past with hi-tech start-up trend and resultant employee mobility).
The average individual employee has little but his labor to sell or to use to make a living. He is often in urgent need of selling it and in no position to object to boilerplate restrictive covenants placed before him to sign. To him, the right to work and support his family is the most important right he possesses.
Id. at 1222, quoting Arthur Murray Dance Studios v. Witter, 105 N.E.2d 685, 704 (Ohio 1952).
And there is evidence suggesting that a legal framework that promotes low employee mobility by strict enforcement of noncompete agreements may have an adverse economic impact on a region.
A comparison of California’s Silicon Valley and Massachusetts’ Route 128 favors limited enforcement of covenants not to compete. The “independent firm-based industrial system” of the 1980s-era Route 128 area, with its low employee mobility, failed to match the adaptability and corresponding growth rate of the Silicon Valley’s “network-based industrial system” characterized by high employee mobility. Proponents of this anti-enforcement view consider the free flow of information and expertise among companies that results from employee mobility essential to innovation and rapid technological development. “Indeed, this unique employment mobility [has contributed] to the success of the Silicon Valley and distinguishes it from other less successful technology areas.”
Id. at 1224, quoting Annalee Saxenian, Regional Advantage 1 (1994), and quoting Hanna Bui-Eve, To Hire or Not to Hire: What Silicon Valley Companies Should Know About Hiring Competitor’s Employees, 48 Hastings L.J. 981, 983 (July 1997).
CONCLUSION
On the record presently before this Court, Banner has not demonstrated a likelihood of success on the merits of this case, nor has it met the other tests required for equitable relief. For that reason, the entry of a preliminary injunction would be inappropriate. Banner’s request for preliminary injunctive relief, then, is DENIED.

The text of the agreement provides: “The Employee agrees that for a period (3) years following termination of this Agreement the Employee shall not directly or indirectly be engaged in or become interested in or serve as officier [sic] or director or employee of any business substancially [sic] similar to that being conducted by the Corporation in any area in which the Corporation conducts business.”

The text of the agreement provides: “Except in the ordinary corse [sic] of the Employee’s employment or in the necessary performance of the Employee’s duties, the Employee will not, directly or indirectly, furnish or divulge the names of any of the Corporation’s customers or lists of any such customers or any other persons who have traded and dealt with the Corporation or who are prospective customers of said Corporation to any person, firm, association, business or corporation; nor will the Employee use or disclose such names or lists for the Employee’s own purposes, or for any purposes not in the ordinary course of the Corporation’s business, at any time during the Employee’s employment or after the Employee’s term of employment is terminated.

“The public have an interest in every person’s carrying on his trade freely: so has the individual. All interference with individual liberty of action in trading, and all restraints of trade of themselves, if there is nothing more, are contrary to public policy, and therefore void. That is the general rule. But there are exceptions: restraints of trade and interference with individual liberty of action may be justified by special circum *708 stances of a particular case. It is a sufficient justification, and indeed it is the only justification, if the restriction is reasonable-reasonable, that is, in reference to the interests of the public, so framed and so guarded as to afford adequate protection to the party in whose favour it is imposed, while at the same time it is in no way injurious to the public.” Club Aluminum, supra, 263 Mass. at 226, quoting Nordenfeldt v. Maxim Nordenfeldt Guns & Ammunition Co. Ltd., [1894] A.C. 535, 565.

Employer goodwill can be protected, but there is no evidence in this case of misappropriation of goodwill. Richmond Brothers, Inc. v. Westinghouse Broadcasting Co., Inc., 357 Mass. 106, 110-11 (1970).